## MONK v. WILMINGTON.

(Filed December 19, 1904).

1. TRESPASS—*Damages—Adverse Possession—Burden of Proof.*

    In an action for damages for trespass to real estate, the plaintiff claiming title by adverse possession, the burden is on him to show continuous possession.

2. ADVERSE POSSESSION—*Presumption—Trespass—The Code, sec. 146.*

    There is no presumption that the possession of real estate is adverse.

DOUGLAS, J., dissenting.

ACTION by John W. Monk and another against the city of Wilmington, heard by *Judge M. H. Justice* and a jury, at April Term, 1904, of the Superior Court of NEW HANOVER County. From a judgment for the plaintiffs the defendant appealed.

*John D. Bellamy, Bellamy & Bellamy, T. E. Brown* and *Empie & Empie,* for the plaintiffs.

    *W. J. Bellamy, E. K. Bryan* and *H. McClammy,* for the defendant.

CONNOR, J. The plaintiff seeks to recover upon a title founded upon a disseisin followed by twenty years' adverse possession. It is conceded that the original trespass by the plaintiff's ancestor was wrongful. This does not necessarily mean that it was such an ouster as put the true owner to an action of ejectment and thereby put the statute of limitations into operation. His Honor correctly told the jury that such possession to ripen into title must be open, notorious, continuous, exclusive, adverse, etc. The defendant insists

that this has not been shown.  The plaintiff, John W. Monk,
says that his father, after purchasing the thirty acres adjoin-
ing the *locus in quo,* in 1876 or 1877, ran his fence in the
manner described by him, which it is claimed covers the
land.   He continued such occupancy as he had until his
death in 1882.   His wife remained in the occupation of the
same character until her death in 1885.   Thomas J. Kenan,
one of the plaintiff's witnesses, the husband of the *feme*
plaintiff, testified: "After she died my wife and John W.
Monk rented the land to one Dodge.   My wife and Mr. Monk
made a division of the land in 1886.   After division I put
some cattle in pasture occasionally.   I know the boundaries
of the thirty-acre tract.   That is an independent tract and
has nothing to do with the land in controversy.   After the
widow of Thomas Monk died my wife and John W. Monk
leased the *locus* for five years to Dodge."   After testifying
to other matters, this witness continues: "Some seven acres
of the land upon which the rock quarry is situated is fit for
cultivation.   You could have planted a crop where the rock
quarry is now.   That land was fit for cultivation.   After the
lease to Dodge was out, John W. Monk, the co-plaintiff, did
not lease the seven acres where the rock quarry is to Souther-
land, or Rhodes, or to any one else.   Rhodes leased from
John W. Monk the thirty-acre tract east of that.   It was
not leased to anybody after the Dodge lease was out, but
Rhodes pastured his cattle there after he leased the other
land from John W. Monk.   Nor did John W. Monk do any-
thing on the land after the Dodge lease was out.   The Dodge
lease was for five years from 1885."   Mr. Rhodes, a witness
for the plaintiff, testified: "In 1893 I rented some land
from Mr. Monk.   I don't say I rented this seven acres.   I
rented all the land that John W. Monk owned between the
New Bern road and the plank road, except five acres which
was reserved on the side next to the plank road, which does

not touch the place where the rock quarry now is. I pastured my cattle upon the land where the rock quarry is in 1893 until the rock quarry was started in 1899 and the fence was torn down. I used the land for pasture where the rock quarry is, and that was all it was used for. The thirty-acre tract and the other land which I rented was used for cultivation. I rented the land that I rented from Mr. Monk for five years from 1893 and until it was sold. When I had my cattle on the land in controversy Mr. W. A. Wright came to me one day, three or four or five years before they began to excavate rock at the rock quarry, and wanted to rent the seven acres in controversy, and I told him that I didn't wish to rent it; that I had more land than I wanted, and I had already rented it; that I didn't want it. I told him I thought I already had it rented, that I had rented it from Monk. He then tried to sell it to me, and I told him that I didn't want to buy. This was in 1895, '96 or '97; it was before the rock quarry was started. I think it was three or four years before the rock quarry was started. The next thing I saw the rock quarry was going on there."

It is elementary learning that the adverse possession necessary to bar the entry of the true owner must be continuous. *Ruffin, J.,* in *Malloy v. Bruden,* 86 N. C., 251, says: "At all times there is a presumption in favor of the true owner, and he is deemed by law to have possession co-extensive with his title, unless actually ousted by the personal occupation of another; and so, too, whenever that occupation by another ceases the title again draws to it the possession and the seisin of the owner is restored, and a subsequent entry by the same wrong-doer and under the same claim of title constitutes a new disseisin from the date of which the statute takes a fresh start." In this case a break of two years was held sufficient to prevent the continuity of the possession. In *Holdfast v. Shepherd,* 28 N. C., 361, a break "of four and a half or five

months" was held sufficient. Here the plaintiff's witnesses testify that there was a period of seven years during which Monk did nothing with the land. Rhodes, under a lease for an adjoining tract, pastured his cattle upon it. From 1877, the date of the first trespass, to 1890 was only thirteen years. The Dodge lease expired in 1890. In 1893 Monk leased to Rhodes the thirty-acre tract adjoining the *locus in quo,* and, so far as we can discover, asserts no claim or possession of the land after that time. Rhodes pastured his cattle on it, but says expressly "I do not say I rented this seven acres." His entire testimony is consistent with that of Kenan, who says that Monk did not lease it to Rhodes. This is consistent with the fact shown by the plaintiffs that when Monk and his sister made partition of their father's land this seven acres was not included, although the deed of Mary E. Monk to her brother for the thirty-acre adjoining tract and some other small parcels contains this language: "The foregoing described tracts, pieces or parcels of land being all the land owned by the late Thomas Monk which lies on the north of the old plank road." The plaintiff says that after the execution of this deed his sister had no possession or occupancy of the land. It is true that Monk says, after the Dodge lease was out, "I leased the property to Mr. Southerland for five years, and after Mr. Southerland's lease was out I leased it to Isaac Rhodes." Two of his witnesses say that the *locus in quo* was not leased to Rhodes. It is difficult to reconcile the testimony of the plaintiffs' witnesses with this statement. The lease was not put in evidence. The burden was on the plaintiff to show the continuous possession.

The defendant asked his Honor to instruct the jury: "There is no presumption that the possession of the plaintiffs and those under whom they claim is adverse." This was refused and his Honor instructed the jury: "If you should find from the evidence that Thomas Monk and his son, J. W.

Monk, had actual possession of the disputed land, said possession is deemed to be adverse, and will be so held until the contrary appears." The defendant excepted. It must be conceded that there is some conflict in the authorities upon this question. *Judge Bynum,* writing for a unanimous court, in *Parker v. Banks,* 79 N. C., 480, said: "The law never presumes a wrong; hence he who alleges an adverse possession must show it as well as allege it." The learned Justice discusses the question with his usual clearness and force, sustaining the opinion by the most approved authorities. This seems to be in accord with section 146 of The Code: "In action for the recovery of real property or the possession thereof, or damages for a trespass on such property, the person establishing a legal title to the premises shall be presumed to have been possessed thereof within the time required by law; and the occupation of such premises by any other person shall be deemed to have been under and in subordination to the legal title, unless it appears that such premises have been held and possessed adversely to such legal title for the time prescribed by law before the commencement of such action." This Court held, in *Ruffin v. Overby,* 88 N. C., 369, "That every possession of land by one other than the claimant is deemed to be adverse until proof to the contrary is made." This section of The Code, which is taken from the New York Code, has never been construed by this Court. We think that the defendant was entitled to the instruction asked.

Several other interesting questions are raised upon the record. The plaintiff put in evidence the deed from Adam Empie, administrator of J. S. Green, to W. A. Wright, bearing date March 16, 1873. He then shows that this deed covers the *locus in quo.* The defendant also puts this deed in evidence. The plaintiff asked his Honor to charge the jury that, in the absence of any evidence showing that Mr.

MONK *v.* WILMINGTON.

Empie was administrator and obtained license to sell this land, the deed conveyed no title. Whether after putting the deed in evidence the plaintiff can thus attack it is not clear. It will be observed that the deed is thirty years old. How far its recitals may be taken as true by reason of its age is an interesting question. If this deed conveys the title, it would seem that the plaintiff, together with the defendant, has shown an unbroken chain of title from the State to Mr. Wright, and that the statutory presumption in regard to the character of Monk's occupancy would arise. Of course if this deed does not convey title his Honor was correct in holding that there was a break in the paper title. It does not appear why the record was not put in evidence. It is to be hoped that if this case shall again come to this Court the record will clearly present for construction the language of section 146 of The Code. It seems that the case of *Ruffin v. Overby,* 88 N. C., 369, is in conflict with this section. This may be explained by reference to the fact that the ouster in that case occurred prior to 1868, as it did in *Bryan v. Spivey,* 109 N. C., 57. The question raised by the brief and argument that the action of the defendant in making the contract and removing the rock, being in violation of the provisions of the charter of the city, is *ultra vires,* not being raised by the pleadings, we deem it best to express no opinion in respect thereto. We think that there should be a

New Trial.

DOUGLAS, J., dissenting. Want of time prevents me, at this late day, from thoroughly discussing the opinion of the Court, and so I will merely indicate one or two of the salient points of error. The opinion apparently attempts to *reconcile* the testimony by *excluding* that of the plaintiff, and then proceeds to find as a fact that there was a break in Monk's possession. In the opinion appear the following significant

paragraphs: "It is true that Monk says, 'After the Dodge
lease was out I leased the property to Mr. Southerland for
five years, and after Mr. Southerland's lease was out I leased
it to Isaac Rhodes.' Two of his witnesses say that the *locus
in quo* was not leased to Rhodes. It is difficult to reconcile
the testimony of the plaintiff's witnesses with this state-
ment." This Court is not called upon to reconcile the testi-
mony of Monk with that of other witnesses, nor has it the
right to say his testimony is any less worthy of credit than
that of others. Monk testifies that he was in actual posses-
sion, and the jury alone can pass upon the credibility of his
testimony and its relative weight as compared with that of
other witnesses.

Again, the opinion of the Court places upon the evidence
of Rhodes the construction most unfavorable to the plaintiff,
while deciding against the plaintiff. It is true Rhodes said
"I do not say I rented this seven acres," but he evidently
meant to say that he did not know whether he had a valid
lease. This is shown by his further testimony that when
Wright wished to rent the land to Rhodes he expressly de-
clined to rent because he had already rented the same land
from Monk. His exact words as stated in the record are as
follows: "I told him I thought I already had it rented; that
I had rented it from Monk." This is clearly consistent with
Monk's testimony, if the question of consistency can be con-
sidered by this Court.

This Court held, in *Ruffin v. Overby,* 88 N. C., 369, that
"Every possession of land by one other than the claimant is
deemed to be adverse until proof to the contrary is made";
that is, that the possessor is deemed to be holding under his
own right. But suppose that this decision is in conflict with
section 146 of The Code, that section does not profess to be
conclusive. The presumption does not arise until the claim-
ant "establishes a legal right to the premises," and not then

even if "it appears that such premises have been held and possessed adversely to such legal title." Monk's own testimony to facts tending to show that he was holding adversely would be sufficient to carry the case to the jury, even if he were not corroborated by others. His enclosing the *locus in quo* with other land, admittedly his own, by a common fence, his using it for pasture, his renting it to others and paying no rent to himself, are all circumstances tending to prove that he was holding adversely.

This case was one peculiarly for the jury, and I do not think that their verdict should be disturbed, except for some material error of law in the trial, certainly not on account of any view we might have as to the weight of conflicting evidence.