W. P. PRICE v. DICKSON WHISNANT, GUARDIAN OF A. H. McRARY, NON COMPOS MENTIS; MATTIE McRARY, EARL BRADFORD AND FINLEY McGEE.

(Filed 5 November, 1952.)

**1. Adverse Possession § 3—**

Where a grantee goes into possession of the tract of land conveyed and also a contiguous tract under the mistaken belief that the contiguous tract was included within the description in his deed, *held* no act of such grantee, however exclusive, open and notorious will constitute adverse possession of the contiguous tract so long as he thinks his deed covers the contiguous tract, since there is no intent on his part to claim adverse to the true owner.

**2. Same—**

In order for possession to be adverse, claimant must hold openly, notoriously, and continuously under known and visible lines and boundaries by making such use of the land of which it is naturally susceptible continuously in the character of owner so as to make him subject to an action in ejectment, and occasional acts of ownership which are unaccompanied by a continuous possession of public notoriety and which amount to no more than separate and unconnected trespasses, is insufficient.

**3. Adverse Possession § 19—Evidence held insufficient to show that possession was continuous and exclusive.**

The grantee in a deed went into possession not only of the tract conveyed but also a contiguous tract under the mistaken belief that the contiguous tract was covered by the description in his deed. Later he found the contiguous tract was not included, and thereupon obtained a quitclaim deed to the contiguous tract from the heirs of his predecessor in title. *Held:* His acts of dominion over the contiguous tract prior to ascertaining the inadvertence were not adverse, and where his evidence of adverse use of the contiguous tract after discovering the mistake tends to show that his return of the land for taxes was not increased after he took the quitclaim deed, that on one occasion he sold hickory timber therefrom which required only two days to cut and remove, that his son cut stove wood from the tract, without any evidence as to how much wood was cut or how frequently, and that he posted "No Hunting" signs on the land, is insufficient to show such continuous and exclusive possession subsequent to the execution of the quitclaim deed as would ripen title, and defendants' motion to nonsuit should have been allowed.

APPEAL by defendants from *Sink, J.*, March Term, 1952, of CALDWELL.

This action was brought by the plaintiff against the defendant A. H. McRary, *et als.*, to establish title to 64.4 acres of land which the plaintiff alleges he owns and to recover damages for trespass. He also alleges that the defendant A. H. McRary claims title to the same tract of land and that the defendants in person and through their agents, servants, and employees, have trespassed upon said land and have cut and removed certain timber therefrom.

The additional facts necessary to a disposition of this appeal will be hereinafter stated.

1. The plaintiff purchased a tract of land in 1913 containing 175 acres, more or less, from T. H. Broyhill. He moved on the land in 1916 with his family and has resided thereon continuously since that time.

2. According to plaintiff's testimony, he thought until sometime in 1921 that his deed from Broyhill covered the 64.4 acres of land now in dispute. In 1914, he began to cut timber on this area. In that year a considerable quantity of telephone and light poles were cut and removed by the plaintiff and his sons, Hamp and Fred Price, and Finley Steele. He peeled a considerable amount of tan bark on the premises in 1916. Some tan bark was peeled in three different years. Fred Price testified, "We cut buck oak for crossties, . . . in 1916, and on up until 1926 . . . We cut firewood and stove wood off of it, and hauled to town and sold it, and cut and hauled firewood to the house, and used it. We cleared up a piece back here on the West end of it, and were going to put out a peach orchard. Papa and Hamp and myself did that, but we never did get to put it out. . . . We cleared up another place down there and tended it. That was in 1916, if I remember right, and we put it in Irish potatoes and beans and corn, and in 1917 Papa sold John Bullinger and Berry Bryant a big body of extract (chestnut) wood. . . . They worked in there off and on for three years practically all over the disputed land."

3. W. P. Price, the plaintiff, testified that his first work on the disputed land was peeling tan bark; that he had done more or less work on the disputed land ever since he had been there and some before he moved on the Broyhill land. "I had some of it tended, some of this disputed land, Irish potatoes and beans and corn, and I plowed it with a plow and mule, and on top of the ridge we cleared some for a peach orchard. That was on the disputed land. We cut and hauled telephone poles from this disputed land, and sold them, or somebody did it for me." The plaintiff discovered in 1921 when he had a survey made of the land described in his deed from Broyhill, that the deed did not cover the disputed area. He thereafter obtained a quitclaim deed, remising, releasing and quitclaiming to him the 64.4 acres now in dispute and a portion of the land he obtained from Broyhill. The quitclaim deed, containing a description of 175 acres of land, was not procured from Broyhill but from the Lee heirs who were the grantors in the deed to Broyhill. The quitclaim deed was not dated but was filed for registration on 13 January, 1926.

4. The plaintiff caused "No Hunting" posters to be placed on the original tract of land purchased from Broyhill, and on the disputed area, in 1930 or 1931. He began paying taxes on the Broyhill land in 1913. He returned for taxes the 175 acres of land called for in the Broyhill deed and has continued to pay thereon ever since. He made no change

in his tax returns after he secured the quitclaim deed, and has continued to pay taxes only on 175 acres of land.

5. According to the plaintiff's evidence, he sold some hickory timber off the disputed land in 1938 or 1939. His son, John Price, testified, "We peeled tan bark and hewed crossties, and we cut out stove wood; we cut out firewood and hauled it to town and sold it. We started going on the place in 1918 and from that time on until a few months before this law suit started. In the last ten years my father sold some hickory timber, but I have got wood on it. . . . I have cut stove wood and have also posted the land. We put posters on the land in 1930 and 1931."

6. George Chester testified that he and another party bought from Mr. Price, "certain hickory timber some years ago, a little bit. . . . it was about 1938 or 1939, . . . I was not familiar with the line around the disputed area. . . . Mr. Price showed me where to start, down next to the branch and on top of the mountain, where to go up the mountain. I don't remember about the land being posted with 'No Hunting' signs. The operation I am talking about lasted about two days."

7. The defendant, A. H. McRary, was adjudged *non compos mentis* 7 February, 1947, and Dickson Whisnant is his duly appointed and acting guardian.

8. The defendants offered evidence tending to show that A. H. McRary is the owner of the disputed land; that he has occupied it adversely for a period of more than twenty years.

Issues were submitted to and answered by the jury as follows:

"1. Is the plaintiff the owner and entitled to the possession of the lands in dispute embraced by the letters B-2P-D-G-F-B, as shown on the court map. Answer: YES.

"2. If so, have the defendants trespassed upon the same? Answer: No."

From the verdict and judgment entered thereon, defendants appeal and assign error.

*Folger L. Townsend and Fate J. Beal for plaintiff, appellee.*
*Burke & Burke and Hal B. Adams for defendants, appellants.*

DENNY, J. This case was before us at the Fall Term, 1950. We granted a new trial because of errors in the charge with respect to the burden of going forward with the evidence and as to what constituted constructive possession. The opinion on that appeal is reported in 232 N.C. 653, 62 S.E. 2d 56.

In the former opinion, we interpreted the allegations of the complaint and the evidence introduced at the trial from which the appeal was taken, to show that the plaintiff was claiming title to the 175 acres of land

described in the quitclaim deed from the Lee heirs, and that the quitclaim deed contained a description of all the land conveyed from Broyhill to Price in 1913, plus the 64.4 acres now in dispute. This interpretation led to the conclusion that Broyhill did not convey to Price, the plaintiff herein, but approximately 110 acres of land. The deed from Broyhill to Price was not introduced in evidence at the former trial. At the last trial, however, it was introduced in evidence by the defendants to show that the plaintiff did get from Broyhill all the land that Broyhill got from the Lee heirs, to wit: 175 acres. And the survey thereof discloses that the original tract of 175 acres which the plaintiff Price purchased from Broyhill in 1913, lies north and northeast of the 64.4 acres of land now in dispute. And one of the southern boundary lines of the Broyhill tract runs with the Robert McRary line 185 poles which is identical with the northern boundary of the disputed area.

The deed introduced by the defendants explains and clarifies the testimony of the plaintiff with respect to the land he now claims under the two deeds. For the purposes of this lawsuit, the plaintiff only alleges that he is the owner of the 175 acres of land described in his quitclaim deed from the Lee heirs. This quitclaim deed purports to release, remise, and quitclaim unto the plaintiff the 64.4 acres of land now in dispute, plus so much of the acreage conveyed to plaintiff by Broyhill as was necessary to make 175 acres. Actually, according to the plaintiff's evidence, he claims to be the owner of the original tract of 175 acres, which he purchased from Broyhill, and of the 64.4 acres of land contained in the quitclaim deed which was not included in his original deed.

It is apparent from the record that the plaintiff got all of the 175 acres of land described in his deed from Broyhill, but none of the land now in dispute lies within the boundaries called for in that deed. This he discovered for the first time in 1921, when he had the land described in his deed from Broyhill surveyed. In the meantime, he had exercised ownership over much of the premises in dispute in the manner above set forth, under the mistaken belief that the description in his deed included the area. When he made this discovery, he could not obtain title to this additional area from Broyhill, since Broyhill had conveyed to him all the land he purchased from the Lee heirs. Consequently, he later obtained and recorded a quitclaim deed from the Lee heirs.

The defendants assign as error the failure of the court below to sustain their motion for judgment as of nonsuit interposed at the close of the plaintiff's evidence and renewed at the close of all the evidence. Therefore, it becomes necessary to consider whether the plaintiff offered sufficient evidence to show title to the disputed area by adverse possession for twenty years, or under color of title for seven years.

On the former appeal, exceptions to the failure of the court to sustain defendants' motion for judgment as of nonsuit, were assigned as error. However, they were not brought forward in the brief and argued as required by Rule 28 of the Rules of Practice in the Supreme Court, 221 N.C. 563; hence, they were taken as abandoned and were not discussed or considered.

The plaintiff makes it clear that when he went into possession of the Broyhill tract of land he intended to claim only the land described in his deed from Broyhill and he thought his deed covered the disputed area. There was no occasion for any change in his belief prior to his discovery in 1921 that the land now in dispute was not covered by his deed. As a consequence, so long as he thought his deed covered the disputed area, his possession was not adverse but a claim of rightful ownership. The court below so instructed the jury. This precise question was passed upon in *Gibson v. Dudley,* 233 N.C. 255, 63 S.E. 2d 630, where *Stacy, Chief Justice,* speaking for the Court, said: "If his possession were exclusive, open and notorious, as he now contends, no one regarded it as hostile or adverse, not even the plaintiff himself, for he was not conscious of using his neighbor's land. 'I thought all the time it was mine.' These conclusions are impelled by the plaintiff's own testimony." See also *Vanderbilt v. Chapman,* 175 N.C. 11, 94 S.E. 703, and *King v. Wells,* 94 N.C. 344.

Therefore, no act of the plaintiff, however exclusive, open and notorious it may have been prior to the time he discovered the area now in dispute was not covered by the description in his deed, will be considered adverse.

In order to sustain the verdict below, the evidence must be sufficient to show that after 1921 the plaintiff openly, notoriously and continuously possessed the disputed land under known and visible lines and boundaries, adversely to all other persons for twenty years, or that he possessed it adversely under color of title for seven years.

What have been the acts of the plaintiff since 1921 to establish title by adverse possession for twenty years, or since 1926 under color of title for seven years? Fred Price, a son of the plaintiff, testified that "we cut buck oak for crossties in 1916 and on up to 1926." He testified to no act of adverse possession or use of the land in any respect after 1926. The plaintiff testified, "He had done more or less work on the disputed land ever since he had been there and some before he moved on the Broyhill land." However, he testified to no adverse act or use of the land after 1921 except having "No Hunting" posters placed on the original tract of land purchased from Broyhill and on the disputed area in 1930 or 1931, and the sale of some hickory timber in 1938 or 1939. And according to the testimony of the purchaser of the hickory timber, its removal required about two days.

The plaintiff has only returned and paid taxes on the original 175 acres of land which he purchased from Broyhill in 1913. He testified, "I kept on paying the same amount, returning it for the same amount after I took the quitclaim deed." This negatives any contention that he has listed or paid taxes on the 64.4 acres of land now in dispute.

John Price, son of the plaintiff, testified, "we started going on the place in 1918 and from that time on until a few months before the law suit started." The sole acts tending to show adverse possession, however, on the part of the plaintiff, were enumerated by this witness as follows: "In the last ten years my father sold some hickory timber, but I have got wood on it. . . . I have cut stove wood and have also posted the land. We put posters on the land in 1930 and 1931." How much stove wood he cut and removed from the premises, whether a single load or more is left to conjecture.

In the case of *Loftin v. Cobb*, 46 N.C. 406, it was held where land was not swamp land, but good turpentine land, having a great number of pine trees upon it fit for making turpentine, that the feeding of hogs upon it and cutting of timber trees from it was not making the ordinary use and taking the ordinary profit of which it was susceptible in its present state, and did not, therefore, show that the acts were done in the character of owner and not of an occasional trespasser. *Locklear v. Savage*, 159 N.C. 236, 74 S.E. 347; *Alexander v. Cedar Works*, 177 N.C. 137, 98 S.E. 312.

This Court also held in *Bartlett v. Simmons*, 49 N.C. 295, that the acts of the plaintiff in going annually for a few weeks at a time, upon land to cut and take off timber and rails, were separate and unconnected trespasses, and did not amount to the exercise of such ownership as could ripen title.

In *Williams v. Wallace*, 78 N.C. 354, the plaintiff claimed title under color by adverse possession for seven years. The Court, in considering the evidence, said: "No witness proves that the plaintiff or those under whom he claims had been in the actual possession of the lands in dispute for a year, a month, or a week continuously, prior to the commencement of the action. From 1857, the date of the deed under which the plaintiff claims, to 1873, when the action was instituted, a period of sixteen years, only a few single acts of trespass were proved, such as cutting ton timber at one time, firewood at another, making rails at another, making bricks at still another, all occasional and at long intervals, unaccompanied by a continuous possession of public notoriety, such as the law requires to be given to the world that the plaintiff is not a mere trespasser, but claims title to the land against all mankind."

In proving title by continuous, open and adverse possession of land for twenty years, or under color of title for seven years, nothing must be left

to conjecture. "Occasional acts of ownership, however clearly they may indicate a purpose to claim title and exercise dominion over the land, do not constitute a possession that will mature title." *Ruffin v. Overby,* 105 N.C. 78, 11 S.E. 251.

In the case of *Shaffer v. Gaynor,* 117 N.C. 15, 23 S.E. 154, where the "acts of dominion consisted of cutting board timber some time during a particular year on a piece of woodland; but there was no evidence to show that they were continuous or, if they were, that the land, though while covered with timber it was not susceptible to other use, might not have been cleared and cultivated, regardless of its capacity for profitable production," it was held that such acts were not sufficiently adverse to mature title.

Again in the case of *Fuller v. Elizabeth City,* 118 N.C. 25, 23 S.E. 922, there was evidence to the effect that plaintiff had sold off portions of the property and offered the balance for sale, and that he had listed and paid taxes on the land continuously since he got his deed for it in 1870, more than twenty years prior to the institution of the action. The Court said: "Plaintiff showed color of title for a greater length of time than was necessary to ripen into a perfect title against the State and all persons not under disability, if it had been accompanied by adverse possession. . . . But we are unable to see from the evidence that plaintiff has been in possession of this land at all, under any of the rules laid down by the law. The fact that he claimed it and offered it for sale, or that he paid taxes on it, is no possession. It must be such possession and exercise of dominion as would subject him to an action of ejectment." The case of *Perry v. Alford,* 225 N.C. 146, 33 S.E. 2d 665, is in accord with this view.

Likewise, where the plaintiff claimed land under color of title, and the testimony as to acts of possession by him, or those under whom he claimed, was that an agent of his grantor raked and hauled straw off the land for one or two years, and that plaintiff's father had farmed an acre or two of the land in controversy, such evidence was held insufficient to ripen title. *Prevatt v. Harrelson,* 132 N.C. 250, 43 S.E. 800.

Adverse possession, necessary to establish title, must be continuous. *Monk v. Wilmington,* 137 N.C. 322, 49 S.E. 345. An occasional entry upon land for the purpose of cutting a few logs is insufficient evidence of adverse possession to establish title. *Land Co. v. Floyd,* 167 N.C. 686, 83 S.E. 687.

Applying the law as laid down in our decisions to the facts disclosed by this record, we are of the opinion that after 1921, the acts of the plaintiff with respect to the premises involved, amount to nothing more than occasional trespasses. Since 1921, the plaintiff has not taken the usual profits from this land or used it in the manner in which it was susceptible of being used. He introduced evidence to the effect that the disputed land

lies "pretty well"; that there is a lot of good timber, white pine, old field oak, and poplar on it. Prior to 1921, when he thought the land belonged to him, he cleared and farmed a small area. He also cleared a small area on which he planned to plant a peach orchard. He peeled tan bark, cut and sold telephone poles, light poles, crossties, firewood and stove wood. However, since 1921, none of the cleared land has been cultivated. The plaintiff has made only one sale of a small number of hickory trees off of the disputed area since 1926; and his son, John Price, who lives with his father, has cut and removed some stove wood from the premises at some time within the last ten years. How much stove wood he cut, and whether he cut such wood more than once, is not made to appear. In our opinion, these isolated cases over a long period of time, together with the posting of "No Hunting" signs on the premises, are insufficient to establish title by adverse possession for twenty years, or under color of title for seven years.

In view of the conclusion we have reached, it is not necessary to consider and determine whether a quitclaim deed that merely releases and quitclaims any interest the grantors may have in the described premises (and not purporting to convey anything), is or is not color of title. What was said in the opinion on the former appeal in this case with respect to the quitclaim deed involved herein being color of title as to the 64.4 acres of land in dispute, while in conformity with the defendants' contention with respect to constructive possession on that appeal, such statement will not be held as determinative of the question whether such quitclaim deed is or is not color of title. A ruling on that question is reserved for future determination in an appeal in which the adjudication thereof is necessary to a decision.

The defendants' motion for judgment as of nonsuit should have been granted, and the ruling to the contrary is

Reversed.